LYNCH, Circuit Judge.
In 1996 the United Brotherhood of Carpenters (UBC) reorganized its system of local unions and state and district councils to create larger “Full Services Regional Councils.” These new councils were given “all legislative and executive powers on all matters relating to the general interest and welfare of affiliated Local Unions and their members.” The UBC’s reorganization was largely a response to the accelerating regionalization of the construction industry. Construction work had become dominated by fewer and larger employers *54 who increasingly handled out-of-state projects. As a result, the UBC determined that its old network of local unions and state and district councils was no longer capable of bargaining effectively with employer associations.
This case involves a challenge by seven dissatisfied rank-and-file members of one regional council, the New England Regional Council of Carpenters (“NERCC”), to the procedure by which their officers are elected. The NERCC members do not directly elect their officers. Rather, the regional council’s officers are elected every four years by delegates who are themselves elected by the members of the local unions. The plaintiffs claim that the Labor-Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 401-531, requires the direct election of the NERCC’s officers because the NERCC is a “local labor organization” within the meaning of the Act, id. § 481(b), notwithstanding the UBC’s designation of it as an intermediate body. ■
The Secretary of Labor initially determined that the NERCC is- an “intermediate” rather than a “local” union body and is thus not required by the Act to conduct direct elections. In Harrington v. Chao, 280 F.3d 50 (1st Cir.2002) (Harrington I), we found the Secretary’s explanation inadequate and remanded the case to her. A new Secretary reviewed the matter and reached the same conclusion, which she explained in a Supplemental Statement of Reasons (“SSR”). Plaintiffs again sued. The district court, interpreting Harrington I, found the conclusion as explained in the SSR to be arbitrary and capricious and issued injunctive relief. The Secretary appealed and at her behest this court stayed the district court’s injunctive order. We now hold that the Secretary’s determination was not arbitrary and capricious. We reverse the district court and order entry of judgment for the Secretary.
I. Background of LMRDA
Concerned about “instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct” by entrenched union officials, 29 U.S.C. § 401(b), Congress in 1959 enacted the LMRDA. Pub.L. No. 86-257, 73 Stat. 519 (1959). Title IV of the Act regulates the election of union officers. 29 U.S.C. §§ 481-83. It requires that, the officers of all “local labor organizations” be elected directly by secret ballot of their members and that these elections take place not less than every three years. Id. § 481(b). If an organization is an “intermediate bod[y],”[1] by , contrast, Title IV allows the union to choose between direct elections of the organization’s officers and election by representatives who are themselves elected,[2] and provides that these elections must occur at least every four years. Id. § 481(d). These requirements are designed “to protect the rights of rank-and-file members to participate fully in the operation of their union through processes of democratic self-government, and ... to keep the union leadership responsive to the membership.” Wirtz v. Hotel, Motel & Club Employees Union, 391 U.S. 492, 497-98, 88 S.Ct. 1743, 20 L.Ed.2d 763 (1968).
The LMRDA does not define the terms “local labor organization” or “intermediate bodies.” The only explicit guidance pro *55 vided in the statutory text for categorizing union bodies as intermediate or local is the Act’s specification of several example “intermediate bodies.” These include “general committees, system boards, joint boards, or joint councils.” See 29 U.S.C. § 481(d).
Given the lack of specific definitions of intermediate and local bodies in the Act, the possibility existed that labor organizations would attempt to label their constituent entities as “local” or “intermediate” for the purpose of dictating which method of election would be used. To curb this potential, Congress authorized the Secretary to promulgate regulations concerning how she would determine whether an organization was local or intermediate. Id. § 489(b). Pursuant to this authorization, the Secretary has supplemented the Act’s limited guidance on the definitions of local and intermediate bodies with regulations providing that:
The characterization of a particular organizational unit as a “local,” “intermediate,” etc., is determined by its functions and purposes rather than the formal title by which it is known or how it classifies itself.
29 C.F.R. § 452.11.
Congress also made a union’s designations of its constituent entities subject to review by the Secretary at the request of union members. 29 U.S.C. § 482(b). To initiate the review process, aggrieved union members who have exhausted internal union remedies file a complaint with the Secretary. Id. § 482(a). If, after investigating the complaint, the Secretary finds probable cause to believe that a violation of Title IV occurred and that it probably infected the outcome of the election, she must bring suit to set aside the election. Id. § 482(b); Wirtz v. Local 153, Glass Bottle Blowers Ass’n, 389 U.S. 463, 472, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968). In that sense, the Secretary has no discretion. See Heckler v. Chaney, 470 U.S. 821, 834, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (section 482(b) “quite clearly withdrew discretion from the agency and provided guidelines for exercise of its enforcement power”). If she decides there is no probable cause, she must explain the rationale for that result in writing. Dun-lop v. Bachowski, 421 U.S. 560, 571-72, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).
At the same time that Congress was working to ensure effective union democracy, it was simultaneously taking steps to safeguard against excessive interference in the internal structure of unions. Most notably, Congress limited the ability to sue for violations of Title IV to the Secretary. See Calhoon v. Harvey, 379 U.S. 134, 140, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). Dissatisfied union members, as a result, are forced to proceed through the Secretary rather than the courts. Congress believed that this requirement would not only curb the potential for excessive litigation, but also facilitate the resolution of labor disputes by promoting uniformity. S.Rep. No. 86-187, at 19 (1959), reprinted in 1959 U.S.C.C.A.N. 2318, 2338.
Given the centrality of the Secretary’s role in monitoring union democracy, the Act allows dissatisfied union members to challenge in federal court the Secretary’s decision not to sue. Bachowski, 421 U.S. at 565, 95 S.Ct. 1851. This is quite unusual. Normally, the federal courts cannot review the decision of an administrative agency not to bring an enforcement action. Heckler, 470 U.S. at 831, 105 S.Ct. 1649. Such decisions are often inherently policy driven and thus best left to the discretion of the agency. See Bachowski, 421 U.S. at 572-73, 95 S.Ct. 1851. Largely for that reason, the Secretary’s decision whether to sue a union for violating Title TV is reviewed only under the highly limited arbitrary and capricious standard con *56 tained in the Administrative Procedure Act, 5 U.S.C. § 706. Bachowski 421 U.S. at 572-73, 95 S.Ct. 1851; Harrington, 280 F.3d at 56. Under that standard, a court reviews the Secretary’s stated reasons for not suing only to determine whether they are “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” See Bachowski 421 U.S. at 565 n. 5, 95 S.Ct. 1851 (quoting 5 U.S.C. § 706(2)(A)); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (same).
In this case, the plaintiff dissident union members argue that the NERCC, while labeled an intermediate body by the UBC, really performs all the functions and purposes of a local union and thus, under the applicable regulations, that the Secretary must sue to bring about direct elections. The Secretary’s decision to the contrary, the plaintiffs argue, is arbitrary and capricious because it failed to apply properly the “functions and purposes” test of the applicable regulations, 29 C.F.R. § 452.11. Each side is supported by able amicus.[3]
II. Procedural History
This is the second time that this case is before us. In Harrington I we reviewed the decision of the then-Secretary that the NERCC was an intermediate body. We held that the decision was arbitrary and capricious in the limited sense that the Secretary’s statement of reasons was inadequate given the applicable regulations and the Secretary’s position in other cases. 280 F.3d at 59-60. The Secretary’s Statement of Reasons in Harrington I did not cite the applicable regulations and used language that appeared to disavow a functional approach. Id. at 57. While the Secretary had “perhaps appli[ed] the test in the regulations,” the limited explanation in her Statement of Reasons made us unable to “say whether the Secretary ha[d] changed her interpretation or departed from the regulation.” Id. at 57-58. Relatedly, the Statement of Reasons did not discuss, much less distinguish, two applicable precedents that were arguably inconsistent with the Secretary’s decision not to sue. Id. In both cases, the functions and purposes of the entity to be classified appeared to be the central focus of the court and the Secretary. Id. at 57-58 & n. 10.
We did not then reach the issue of whether the Secretary’s conclusion that the NERCC was an intermediate organization was arbitrary and capricious. See id. at 60. Rather, we remanded to the Secretary to reopen and advised her that if she again decided not to sue, a new statement of reasons “which addresses both the application of the functions and purposes test of 29 C.F.R. § 452.11, and whether her decision is consistent with her precedents” would be required. Id. at 60-61.
On January 31, 2003, the Secretary issued a Supplemental Statement of Reasons (“SSR”) that found, once again, that the NERCC is an intermediate body under the LMRDA and is thus not required to conduct direct elections. The complainants challenged this determination in district court and quickly moved for summary judgment. Relying largely on Harrington I, the district court granted the motion on October 8, 2003, holding that the Secretary’s decision not to sue was arbitrary and capricious. Harrington v. Chao, 286 F.Supp.2d 80, 85-86 (D.Mass.2003). The district court subsequently ordered the Secretary “to take appropriate action” consistent with its determination. On Febru *57 ary 20, 2004, we stayed the district court’s order pending the resolution of the Secretary’s appeal.
III. The Secretary’s Supplemental Statement of Reasons
In explaining the Secretary’s conclusion that the NERCC is an intermediate body, the SSR outlined three “basic principles [that] may be discerned from the language and purpose of the LMRDA and the applicable regulations.” SSR, at 3.
First, the Secretary stated that she had' not abandoned the applicable regulations and explained that classifying a union entity as intermediate or local does indeed require looking to the entity’s “functions and purposes” rather than “its formal title or nominal placement within [the] organization.” Id. The critical inquiry, the SSR continued, is thus “whether the intermediate body has taken on so many of the traditional functions of a local union that it must in actuality itself be considered a local union.” Id.
Second, the SSR explained that the legislative history of the Act made clear “that ‘intermediate bodies’ are permitted to wield real and significant authority within a labor union without being treated as ‘local’ bodies for purposes of the LMRDA.” Id. at 4. The SSR identified those powers as including the negotiation of collective bargaining agreements and the discipline of union members.
Third, the SSR stated that an entity’s placement within the structure of a union is also “highly relevant” in determining whether it' is local or intermediate.[4] Id. at 5. As a consequence, the SSR concluded that “although the Secretary will not defer to a union’s own characterization of an entity as an intermediate body or a local labor organization, it is proper for the Secretary to take account of an entity’s placement in the union’s structure in making the determination whether it is an intermediate body or local labor organization.” Id.
. From these principles, the Secretary concluded that the NERCC is indeed an intermediate body. The SSR noted that the NERCC is structurally in the middle tier of the UBC; it undeniably supervises numerous local union organizations while itself being subordinate to the UBC International body. This fact was not determinative, however.[5] Rather, the SSR looked to the “functions and purposes” of the NERCC, which it described as follows:
[The NERCC] negotiates collective bargaining agreements. It has exclusive authority to hire, discipline, promote, and fire all organizers and business representatives within the New England region. The NERCC’s Executive Secretary-Treasurer supervises and directs all representatives and organizers. The stewards are appointed by the NERCC’s representative, must report all problems arising at the job site to the *58 representative, and serve at the representative’s discretion.
Id. at 9-10. Although many of these functions may be traditionally associated with local unions, the SSR noted that several of them, most notably the negotiation of collective bargaining agreements, were increasingly handled by intermediate unions throughout the 1950s, when the Act was passed. But the SSR declined to articulate a list of functions exclusively performed by an intermediate organization as contrasted to a local body.
The SSR also looked to the functions and purposes of the local unions, on the theory that if “the middle tier subsume[d] so much authority from its subordinate unions ... it must be deemed to have itself also become a local labor organization subject to the Act’s direct election requirements.” Id. at 9. In this case, the SSR opined that the subordinate locals are not “mere administrative arms” of the NERCC but instead play “a significant role in dealing with their members.” Id. at 10. The locals are independently chartered, have identifiable memberships, elect their own officers, have their own by-laws, keep separate offices and bank accounts, and may hold their own meetings. They also determine and collect monthly dues, and may make rules consistent with the UBC constitution and laws. Moreover, the local unions also have various responsibilities and liabilities: they are responsible for the carelessness or negligence of their officers; they collect fines for dues or fees in arrears; and most grievances are resolved by local stewards (although those stewards are appointed by the NERCC). Local unions also exert influence over the UBC International and the activities of the regional councils. Changes to UBC bylaws can be initiated when three local unions join together and locals play a role in ratifying collective bargaining agreements. Based on consideration of these functions, the SSR determined that there was “no basis for concluding that the NERCC must ... be considered a local to carry out the purpose of the statute.” Id.
The SSR also distinguished the two cases noted in Harrington I, in which the Secretary had taken the position that a union entity was local because it performed traditionally local functions. In Donovan v. International Brotherhood of Boilermakers, 736 F.2d 618 (10th Cir.1984), the labor body at issue occupied the bottom level of the union’s organizational structure.[6] Id. at 623. Similarly, while the labor organization at issue in Shultz v. Employees’ Federation of the Humble Oil & Refining Co., No. 69-C-54, 1970 WL 5445, 1970 U.S. Dist. Lexis 12288 (S.D.Tex. March 31, 1970), was nominally intermediate in the union’s structure, in reality the so-called “locals” that it supervised were “merely administrative arms” of the entity itself and had no significant independent authority. Id. 1970 WL 5445, 1970 U.S. Dist. Lexis 12288, at *11.
IV. Analysis
Review of the district court’s grant of summary judgment is de novo. Rankin v. Allstate Ins. Co., 336 F.3d 8, 11 (1st Cir.2003). Here, we decide whether the Secretary’s decision that the NERCC is an intermediate body falls within the narrow band of administrative determinations that fail the deferential arbitrary and capricious test.
*59 We begin our analysis of the plaintiffs’ claim by making a basic but important point: the Secretary was entitled to consider where the NERCC was located in the UBC’s organizational structure when determining whether the NERCC was an intermediate or local body, so long as that factor was not conclusive on its own.[7] The consideration of the NERCC’s place in the overall union structure is consistent with the LMRDA’s use of the term “intermediate.” When Congress uses a statutory term that it does not expressly define, that term should normally be construed according to its ordinary or natural meaning. Smith v. United States, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). The term “intermediate” is most naturally understood to refer to the body’s placement in the union hierarchy. See Webster’s Third New International Dictionary 1180 (1993) (defining intermediate as “lying or being in the middle place or degree”); Oxford English Dictionary (2d ed.1989) (defining intermediate as “coming or occurring between two things, places”). Moreover the statute defines “labor organization” as including a “general committee, joint or system board, or joint council” — all of which are explicitly defined in 29 U.S.C. § 481(d) as “intermediate” — that is “subordinate to a national or international labor organization.” 29 U.S.C. § 402(i) (émphasis added). The description of each of these illustrative intermediate labor organizations as “subordinate” to the national or international bodies lends further support to including a structural element in categorizing a union body as intermediate or local. See Webster’s, supra, 2277 (defining subordinate as “placed in a lower order, class or rank”); Black’s Law Dictionary 1439 (7th ed.1999) (defining subordinate as “placed in or belonging to a lower rank, class or position”).
The “functions and purposes” to which the regulations refer do not exclude looking at the placement of a body within the union structure. Much to the contrary, as the Secretary observed in the SSR, a body’s location in the union’s structural hierarchy may well inform the determination of what its functions and purposes are. Because the constituent parts of any union are organized together to achieve the desired results, the placement of an entity in the union hierarchy and the functions of other union bodies both below and above it are relevant to determining the functions and purposes of the entity at issue. Consideration of the structural placement of an entity in a union is inherent in the regulatory test of functions and purposes.
But even if the union’s structure were unrelated to the test in the regulations, the Secretary could still consider it. The regulation does not purport to list an exclusive set of permissible considerations, but only to require that a union entity’s status as local or intermediate be determined by its “functions and purposes” rather than merely its formal title or nominal classification. See 29 C.F.R. § 452.11. An agency is not deemed to have acted inconsistently when it considers a matter upon which the applicable regulation is silent. Thomas Jefferson Univ., 512 U.S. at 512, 114 S.Ct. 2381 (the Secretary’s view is entitled to less deference if it conflicts with a “prior interpretation,” but the petitioner can not *60 “infer from [] silence the existence of a contrary policy”). Given the substantial deference that we afford an agency’s interpretation of its own regulations, Martin v. Occupational Safety & Health Rev. Comm’n, 499 U.S. 144, 150-51, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991), as well as its interpretation of a statute that it implements, Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Secretary’s consideration of the UBC’s overall structure was clearly permissible.
The real issue in this case is not whether the Secretary was permitted to consider a union’s structure in addition to the functions and purposes of the body at issue, but whether, when the Secretary applied the functions and purposes test, she did so in an impermissible manner. The parties share common ground, as the Secretary’s reply brief notes, on “the basic point that when an intermediate’s role becomes so overwhelming or omnipresent in union affairs, the requirements for direct elections must apply.” The difference between the parties is “not one of principle, but over where to draw the line.”
The plaintiffs’ key argument is that the SSR departed from the applicable regulation because it did not analyze the functions and purposes of the entity to be classified — the NERCC. Rather, the plaintiffs claim that the Secretary focused on the functions and purposes of the locals themselves. This approach, according to the plaintiffs, contradicts the regulation’s language as well as the Secretary’s prior application of that regulation in Boilermakers and Humble Oil. The plaintiffs claim that the Secretary was required to categorize various functions and purposes as either intermediate or local, and then to determine with which characterization the NERCC’s functions and purposes are more closely aligned.
The SSR, however, does look to the functions and purposes of the NERCC, and it finds that some of those functions and purposes — most notably, collective bargaining — are historically associated with “intermediate” bodies, even if they are associated with local bodies as well. The SSR notes that the Senate Committee Report to the LMRDA stated that intermediate bodies can “exercise responsible governing power,” though the precise contours of that power are not elaborated on in the report. See S.Rep. No. 86-187 (1959), at 18, reprinted in 1959 U.S.C.C.A.N. 2318, 2336. Such legislative history plays a particularly important role in interpreting the LMRDA. See Wirtz, 389 U.S. at 468, 88 S.Ct. 643 (The “proper construction [of a labor statute] frequently requires consideration of its wording against the background of its legislative history and in the light of the general objectives Congress sought to achieve. The LMRDA is no exception.” (citation omitted)).
Understood against the backdrop of union organizations at the time the LMRDA was adopted in 1959, it is clear that the “responsible governing power” referenced in the Senate Report includes the negotiation of collective bargaining agreements and member discipline. Before 1959, it was not uncommon for intermediate bodies to engage in both collective bargaining and member discipline. Herbert J. Lahne, The Intermediate Union Body in Collective Bargaining, 6 Indus. & Lab. Rel. Rev. 163, 163-64 (1953). That fact was also reflected in various court cases and NLRB decisions at the time. See, e.g., May Dep’t Stores Co. v. NLRB, 326 U.S. 376, 380, 66 S.Ct. 203, 90 L.Ed. 145 (1945); NLRB v. Brown & Root, 203 F.2d 139, 141-43 (8th Cir.1953); Ill. Bell Tel. Co., 100 N.L.R.B. 101, 104 n. 8, 1952 WL 9903 (1952). Indeed, the primary motivation for creating *61 intermediate bodies was so that they could negotiate collective bargaining agreements. See Lahne, supra, 6 Indus. & Lab. Rel. Rev. at 164. Intermediate bodies originated “under circumstances where the nature of an industry and its economics [had] been such as to make it imperative for several locals of the same international in an area to act in concert in collective bargaining and grievance handling.” Id. These bodies prevented splits and conflicts between local unions and provided “a means of insuring unified action in the area of collective bargaining.”[8] Id. at 166. As the Secretary reasonably concluded, “[h]istorieally, unions have not restricted the authority or responsibility for important representational activities — for example, collective bargaining and the discipline of union members — to local unions.”
Plaintiffs challenge the relevance of this argument based on historical context by arguing that Congress did not have in mind these intermediate bodies because their officers were directly elected by union members. This argument, in our view, is a non sequitur. The issue is what powers Congress, at the time it passed the LMRDA, believed intermediate bodies exercised. Congress was well aware that many intermediate bodies were responsible for collective bargaining and member discipline when it chose to let them decide for themselves whether to have direct elections by their membership.
The plaintiffs’ more substantial argument appears to be, at root, that collective bargaining and member discipline have previously been classified by both the Secretary and the courts in Boilermakers and Humble Oil as intrinsically local, rather than intermediate, functions. Indeed, the Boilermakers court described the functions of the union body at issue, which included negotiating the basic terms of collective bargaining agreements and grievance handling (which may have included member discipline), to be the functions of a local. See 736 F.2d at 623. And the court in Humble Oil similarly classified collective bargaining and member discipline as “local” functions. 1970 WL 5445, 1970 U.S. Dist. LEXIS 12288, at *13. Even the SSR included collective bargaining and disciplinary functions as within a “common core of functions” performed by local unions.
But as the Secretary points out, in Boilermakers the entity being reviewed was at the lowest level of the union because there were no subsidiary entities. See 736 F.2d at 622-23. Moreover, the issue in Boilermakers was whether the entity in question was a labor organization at all and if so whether it was national or local; the entity did not claim to be intermediate. See id. As such, the court was not confronted with *62 the possibility that the union organization’s functions might be associated with intermediate as well as local bodies. Humble Oil is also distinguishable: the entity at issue had no subordinate organizations and claimed that it could not be a local because its divisions were themselves separate locals, a contention the court rejected when it found the divisions to be “mere administrative arms.” See 1970 WL 5445, 1970 U.S. Dist. LEXIS 12288, at *11-*12.
More fundamentally, the plaintiffs’ argument falsely assumes that because some locals exercise bargaining and member discipline powers, it follows that all organizations that exercise those powers, regardless of their placement in the union hierarchy, must also be locals. This assumption is inconsistent-with the explicit Congressional determination that entities that exercise responsible governing powers may be intermediate. And nothing in the statute requires the Secretary to come up with a taxonomy of functions that may only be exercised by one type of entity and not another.[9] Indeed, such a categorical and inflexible approach would tie the Secretary’s hands in an evolving labor market and most likely would upset the carefully calibrated system of cheeks and balances in the statute.[10] As the SSR points out, “the line between local and intermediate functions is not fixed and immutable.” SSR, at 9. From this, the SSR reasonably concludes that “Boilermakers and Humble Oil do not purport to address precisely which functions and purposes are so intrinsically local in nature that any labor organization having those functions and purposes must be a ‘local union’ for purposes of the LMRDA.” Id.
Plaintiffs’ final major argument takes issue with the SSR’s conclusion that the functions and purposes of the subordinate local unions should also be scrutinized to ensure that they are “performing meaningful functions” and “continue to exist for purposes associated with local labor organizations.” SSR, at 4. According to the plaintiffs, the functions and purposes of the UBC locals are irrelevant in determining whether the NERCC is an intermediate body. There is a certain irony in the plaintiffs’ taking this position;[11] the Secretary’s examination of the locals actually benefits potential plaintiffs by acting as a *63 check on the powers of entities labeled as intermediate and ensuring that locals have meaningful responsibilities.[12] Nothing in Harrington I or in the text of LMRDA precludes the Secretary’s approach. In fact, it is entirely consistent with the Secretary’s position in Humble Oil, which asked if the entity asserted to be a “local” was nothing more than an administrative arm of a local. 1970 WL 5445, 1970 U.S. Dist. LEXIS 12288, at *11. The Secretary’s examination of the relative power of the locals is hardly unreasonable.
Still, we think there is something to the plaintiffs’ argument that the Secretary’s approach to applying the functions and purposes test in the regulations, as articulated in the SSR, has apparently shifted in emphasis. As the district court noted, the Secretary’s regulation does not say anything about looking to the overall union structure to determine whether a union entity is local or intermediate. But, as we explained in Harrington I, the Secretary is permitted some flexibility, so long as she provides some explanation for shifting her emphasis. 280 F.3d at 58. We see nothing arbitrary in the Secretary’s shift here, which she thoroughly explained. The question before us is not whether the Secretary could have permissibly reached the opposite conclusion, but whether the conclusion she did reach was “so irrational as to constitute the decision arbitrary and capricious.” Bachowski, 421 U.S. at 573, 95 S.Ct. 1851.
The interests in union democracy that the plaintiffs seek to vindicate are of great importance. But Congress, perhaps mindful that intermediate organizations may choose to adopt a system of direct elections on their own,[13] imposed strict constraints on the scope of review by courts under the LMRDA.
V.
The judgment of the district court is reversed and the case is remanded with instructions to enter judgment for the Secretary. No costs are awarded.

. Similar provisions in Title IV regulate the election of officers for national or international bodies. 29 U.S.C. § 481(a).

. The LMRDA thus does not prohibit elections for officers of intermediate union bodies, but merely does not mandate them. See 29 U.S.C. § 481(d).

. Both the Association for Union Democracy (AUD) and the UBC have participated as ami-ci and we are grateful for their assistance.

. The SSR also noted that "in the 44-year history of the LMRDA, the Department has never brought suit contending that an intermediate body that supervised other entities that were indisputably labor organizations was itself a local labor organization subject to the direct election requirements.” SSR, at 8. The SSR nonetheless allowed for such a possibility.

. At one point, the SSR does state that "a labor organization at the middle tier of a union is presumptively an intermediate organization.” SSR, at 9 (emphasis added). We do not understand this language to create a presumption in the sense that the complainant carries the burden of overcoming that fact The Secretary is charged by statute with independently determining whether a union is violating Title IV of the Act. See 29 U.S.C. § 482(b).

. In distinguishing Boilermakers, the SSR suggested that a body must be in an intermediate structural position in order to be considered an intermediate body. This rule does not appear in the the Secretary’s analysis of the status of the NERCC and we assume that there might, under the Secretary's view, be some circumstances in which a union body could be an intermediate even if it had no subordinate entities.

. At times, the plaintiffs' arguments suggest that the fact that there exist numerous local unions within the UBC that are separate from and subordinate to the NERCC is irrelevant to determining whether the NERCC is itself a local or intermediate body. At other times, the plaintiffs' arguments appear not to embrace this position. To the extent that plaintiffs do make the argument that the Secretary cannot consider a union's structure, it is plainly incorrect.

. Interestingly, the Lahne article discusses at length the intermediate bodies within the Carpenters union during the early 1950s. Lahne, supra, 6 Indus. & Lab. Rel. Rev. at 165-66. These District Councils, as they were then known, formulated the collective bargaining demands of the union, negotiated with their counterpart, the Master Builders Association, and approved the ultimate agreement. Id. at 165. Moreover, only these Councils could call for a strike and business agents of the councils policed all agreements. Id.
By contrast, the Lahne article describes the local Carpenter union bodies as being "left only with the collection of dues, administration of benefit plans, and social activities.” Id. Lahne concludes that "[i]t is clear that the district councils of the Carpenters are the real governing and bargaining bodies of the union. Hardly a ripple would be caused if the locals lost their legal entities entirely....” Id. at 166.
It would be very odd, in light of this history, to conclude that the Secretary was mandated to find that the replacement organization, the NERCC, made up of old District Councils that were themselves intermediate, is a local entity-

. The AUD argues that it would not be difficult for the Secretary to compile a list of "core functions and purposes of an intermediate body, and then [compare] the functions and purposes of a contested body to that definition." The AUD proffers two potential sources: 1) scholarship, such as that contained in Derek C. Bok & John T. Dunlop, Labor and the American Community 150 (1970), and 2) definitions that further the purpose of the LMRDA. Finally, AUD suggests that if the Secretary is to employ any presumption at all, she should presume the organization at issue is local and must hold direct elections. These expressions of policy may or may not be sensible, but they are choices that are committed to the discretion of the Secretary and not the courts.

. The plaintiffs say that in the absence of a fixed standard there is little guidance to the parties on how to act and so the result is arbitrary. But the law repeatedly uses flexible and multi-factor tests, eschewing categorical approaches as ill-suited to handle the infinite variations in potential problems to be solved.

.In fact, counsel for AUD refused to join plaintiffs’ position at oral argument. Instead, AUD argued that it was permissible to look at the functions of the locals but that here they "perform no labor relations functions.” As to AUD’s argument, we think that the Secretary was not arbitrary and capricious in coming to the conclusion that the locals here do play a sufficiently significant role in the UBC's overall operation. As the Secretary noted, the UBC locals, inter alia, ratify collective bargaining agreements, are involved in the resolution of grievances, can initiate changes in UBC by-laws, and determine and collect monthly dues.

. The AUD, citing to Alice H. Cook, Union Democracy: Practice and Ideal. An Analysis of Four Large Local Unions 183-89 (1963), argues that the Secretary’s focus on whether there are subsidiary organizations could be dangerous. It could permit "many hitherto unquestioned locals to exempt themselves from the LMRDA’s requirement of direct elections, by creating subdivisions holding 'the irreducible minimum' of functions.” Such a risk exists, but it also existed under the regulations simpliciter. Our task is not to decide a hypothetical case about a local fracturing its functions downward, see Humble Oil, 1970 WL 5445, 1970 U.S. Dist. LEXIS 12288, at *13, but to decide this case, which concerns aggregation and consolidation of functions upward to an intermediate organization.

. The LMRDA allows UBC, on its own, to decide that the NERCC officers will be directly elected by union members. See 29 U.S.C. § 481(d). But the UBC, as amicus, notes that direct elections impose financial and other costs that a given union may decide outweigh the benefits.